EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: Enrique Godinez Morales | 2004 TSPR 17 <br><br> 160 DPR ____ |

Número del Caso: TS-2414

Fecha: 3 de febrero de 2004

Oficina de Inspección de Notarías:

Lcda. Carmen H. Carlos
Directora

Abogado de la Parte Querellada:

Lcdo. Ángel R. Marrero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Enrique Godinez Morales

TS-2414

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 3 de febrero de 2004

El recurso que hoy ocupa nuestra atención nos brinda la oportunidad de expresarnos en torno a un aspecto sumamente importante de la práctica notarial, a saber: el procedimiento de inspección y examen de protocolos. Asimismo, nos permite examinar el alcance de las facultades que poseen los inspectores de protocolos en dicho proceso y apuntalar ciertas faltas incurridas por los notarios en la preparación de instrumentos públicos.

I

El 25 de enero de 1999 la Inspectora de Protocolos, Lcda. Norma Acosta de Santiago citó

al licenciado Enrique Godinez Morales con el fin de inspeccionar su obra notarial. La referida inspección se efectuó los días 2 y 3 de marzo de 1999, enfocándose la misma en el protocolo correspondiente al año 1994. La Inspectora le entregó al notario las correspondientes hojas de "Señalamiento Preliminar de Faltas", en las que incluyó varias deficiencias encontradas en los instrumentos públicos autorizados por éste.

Así las cosas, el 17 de agosto de 1999, la Inspectora volvió a reunirse con el notario para reinspeccionar el protocolo de 1994 encontrándose con que, a esa fecha, éste no había corregido algunas de las deficiencias que le habían sido señaladas. Como consecuencia, le notificó otro "Señalamiento de Faltas" que incluyó los siguientes defectos aún no subsanados: (i) en las escrituras núm. 70 y 80 de constitución de hipoteca sobre bienes inmuebles otorgadas por personas casadas no surgían los elementos necesarios para determinar si en las mismas se requería la comparecencia de los cónyuges de los otorgantes; y (ii) en la escritura núm. 442 se omitió consignar la fe del conocimiento y capacidad de los otorgantes supliéndose dicha falta mediante añadidura puesta al final de la escritura, la cual fue firmada únicamente por el notario.

A raíz de estos señalamientos, el licenciado Godinez le entregó a la Inspectora un "Memorando Legal sobre Divergencia de Criterio" donde expresó sus objeciones a las faltas señaladas en la reinspección y solicitó,

además, la aprobación del protocolo de 1994. Por su parte, el 10 de septiembre de 1999, la Inspectora sometió un informe ante la Directora de la Oficina de Inspección de Notarías sobre las referidas deficiencias no corregidas. Ésta le concedió al licenciado Godinez un término de quince (15) días para que se expresara en torno al mismo. Éste contestó reiterándose en las objeciones que ya antes había expuesto.

Con el fin de discutir las objeciones del licenciado Godinez Morales al informe rendido por la Inspectora, la Directora lo citó a una reunión que fue celebrada el 6 de diciembre. <u>En la misma la Directora le informó, entre otras cosas, que la Oficina de Inspección de Notarías (O.D.I.N.) había asumido una política de inspección que requería a los inspectores de protocolos fiscalizar la comparecencia de ambos cónyuges en los instrumentos correspondientes siempre que ello fuera necesario a tenor con las enmiendas al Código Civil efectuadas en 1976, relativas a la co-administración de la sociedad legal de bienes gananciales.</u>[1]

---

[1] La referida directriz impartida el 11 de febrero de 1993 por el entonces Director de la O.D.I.N., Lcdo. Govén D. Martínez Surís, disponía lo siguiente:

> A partir del 21 de mayo de 1976 –fecha de vigencia de la Ley Núm. 51 aprobada por la Asamblea Legislativa– son actos de disposición tanto de la venta de bienes inmuebles de la sociedad de gananciales como la compra de dichos bienes para dicha sociedad, requiriéndose para ambos actos el consentimiento por escrito de

(Continúa . . .)

A raíz de esta reunión, la Directora determinó que procedía continuar con la inspección de los otros protocolos pendientes del licenciado Godinez correspondientes a los años 1995 al 1998[2]; ello por entender que era prudente contar con el resultado de la inspección de toda la obra notarial de éste para así poder identificar la repetición de cualquier deficiencia previamente señalada. De este modo, del 13 al 25 de enero de 2001 la Inspectora prosiguió con la referida inspección. En el curso de la misma se le entregó al notario hojas de "Señalamientos Preliminares de Faltas" donde, además de señalársele faltas de variado carácter, también se encontraron <u>deficiencias similares</u> a las incurridas en las escrituras núm. 70 y 80 del protocolo de

---

ambos cónyuges. <u>Aguilú</u> v. <u>Sociedad de Gananciales</u>, 1977, 106 D.P.R. 652.

Este requisito de la comparecencia de ambos cónyuges y nuestra fiscalización cubre desde mayo 21 de 1976 que se enmendó el Código Civil hasta el presente y no desde que se aprobó la Ley Notarial en el año 1987. Véase: Memorando a los Inspectores, Apéndice del Informe de la Directora de la Oficina de Inspección de Notarías, Exhibit XXIII, pág. 280.

[2] Por otra parte, es menester señalar que luego de la reunión celebrada, la Directora le envió una carta al notario donde, entre otras cosas, hizo alusión a dos Resoluciones no publicadas emitidas por este Tribunal --*In re* Carmen Ibarra Ortega, Resolución de 15 de febrero de 1991 e *In re* George López Keelan, Resolución de 11 de febrero de 1988-- en las que se ordenaba a los notarios subsanar la misma clase de deficiencias que le fueron señaladas al licenciado Godinez en cuanto a hacer constar el carácter privativo del inmueble cuando el cónyuge de la persona otorgante no comparecía en la escritura y sólo se menciona por nombre.

1994. En febrero de 2000 el notario Godinez volvió a comunicarse por escrito con la Directora reiterando sus objeciones y reafirmando su decisión de no corregir las deficiencias aún pendientes del protocolo de 1994. Además, solicitó nuevamente la aprobación del referido protocolo.

Durante los meses siguientes la O.D.I.N. no recibió noticias del licenciado Godinez y los intentos de la Inspectora para tratar de comunicarse con éste y coordinar una cita de reinspección fueron infructuosos. No fue sino hasta el 30 de junio de 2000 que se pudo realizar la referida reinspección. En el curso de la misma la Inspectora encontró que, a pesar del mucho tiempo transcurrido, el notario aún no había corregido las deficiencias señaladas en el protocolo de 1994 y otras correspondientes a los protocolos de 1995 a 1998. En vista de ello, la Inspectora sometió otro informe a la Directora indicando que, a pesar de haber concluido la inspección de la obra notarial del licenciado Godinez, resultaba imposible aprobar los protocolos de 1994 a 1998 por motivo de que los mismos contenían múltiples deficiencias pendientes de subsanar.[3]

---

[3] Además de la deficiencia relativa a dejar de consignar el carácter privativo del inmueble en casos donde sólo comparecía uno de los cónyuges, se identificaron otras omisiones como la falta de dación de fe del conocimiento de otorgantes, falta de firmas o iniciales de algún compareciente o representante de éste, falta de firma y rúbrica del notario en la nota de cierre del protocolo y deficiencias en los sellos de rentas internas cancelados en las escrituras.

El 18 de agosto de 2000 la Directora notificó al notario sobre el informe de la Inspectora, informándole: que la inspección de los protocolos para los años 1994 a 1998 había concluido; que la O.D.I.N. estaba consciente de su posición con respecto al protocolo de 1994; y que dicha Oficina había determinado acumular las divergencias de criterio sobre la misma clase de deficiencias que habían surgido en la inspección del resto de su obra notarial. Por otra parte, le recomendó que subsanara las deficiencias pendientes ya que, de lo contrario, tendría que someter la controversia ante la consideración del Tribunal Supremo. El 15 de septiembre el licenciado Godinez respondió a dicho informe expresando haber corregido aquellas deficiencias respecto a las cuales no tenía objeción y reiterando su posición en cuanto a los demás señalamientos en controversia.

El 20 de septiembre la Inspectora visitó nuevamente al notario para reinspeccionar los protocolos y corroborar las correcciones supuestamente realizadas en éstos. Si bien aprobó los protocolos de los años 1995 y 1996, le entregó al licenciado una hoja de "Señalamiento Preliminar de Falta – Inspección Final" que contenía todas las deficiencias encontradas en los protocolos de 1994, 1997 y 1998 que eran objeto de controversia. El 25 de septiembre de 2000 la Inspectora presentó ante la Directora su informe final relacionado a los protocolos de 1994 al 1998. En éste indicó que procedía la aprobación de los

protocolos de 1995 y 1996, mas no la de los protocolos correspondientes a los años 1994, 1997 y 1998. Ello en vista de que en los mismos quedaron pendientes de subsanación las deficiencias señaladas en las escrituras número 70, 80 y 442 del protocolo de 1994; 179 del protocolo de 1997; y 114 y 205 del protocolo de 1998.

El 29 de septiembre el licenciado Godinez respondió al informe de la Inspectora reiterando su oposición a las deficiencias señaladas. Así las cosas, el 13 de noviembre de 2000 la Directora de la Oficina de Inspección de Notarías compareció ante este Tribunal, al amparo de la Regla 79 (E) del Reglamento Notarial de Puerto Rico, solicitando que ordenáramos al licenciado Godinez la subsanación de las faltas señaladas.

El licenciado Godinez compareció ante el Tribunal en solicitud de que le ordenemos a la O.D.I.N. la aprobación de sus protocolos correspondientes a los años 1994, 1997 y 1998. En síntesis, sostiene: (i) que en vista de que no se cumplieron con los términos establecidos en las Reglas 79 y 80 del Reglamento Notarial, debía presumirse que la Inspectora aceptó el criterio del notario sobre las deficiencias señaladas en el protocolo de 1994 y que por haber transcurrido los referidos términos ya la Directora no tenía disponible el remedio provisto en la Regla 79(E) de presentar un informe ante el Tribunal Supremo; (ii) que la Inspectora se excedió en sus facultades al señalar la deficiencia relacionada a no consignar la procedencia del

inmueble hipotecado en escrituras otorgadas por personas casadas donde sólo comparecía uno de los cónyuges; y (iii) que no se cometió la deficiencia señalada en la escritura núm. 442 porque la Ley Notarial autoriza al notario a expresar su fe notarial en cualquier parte de la escritura, requiriendo solamente que el notario cierre el instrumento con su firma, después de la de los otorgantes; y que éste tiene discreción para utilizar, o no, el mecanismo del acta de subsanación cuando se trate de defectos u omisiones que no afectan el acto jurídico.

Estando en posición de resolver la controversia, hoy ante nuestra consideración, procedemos a así hacerlo.

II

A

Sabido es que el poder para reglamentar la profesión de la abogacía en Puerto Rico recae exclusivamente en el Tribunal Supremo como parte de sus facultades inherentes. López Santiago, Ex parte, 147 D.P.R. 909 (1999); *In re* Gómez Morales, 146 D.P.R. 837 (1998). Del mismo modo, le corresponde a este Tribunal regular todo lo concerniente al puntilloso ministerio del notariado. *In re* Gómez Rijos 129 D.P.R. 811, 815 (1992), *In re* Concepción Velázquez, 126 D.P.R. 474, 475 (1990); véase, además: S. Torres Peralta, El Derecho Notarial Puertorriqueño, Ed. Publicaciones STP, Inc., San Juan, 1995, pág. 18.1. En virtud de esta facultad el Tribunal Supremo ha delegado en

la Oficina de Inspección de Notarías (O.D.I.N.) la importante tarea de  supervisar la profesión notarial. Artículos 62 y 67 de la Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987, según enmendada; 4 L.P.R.A. secs. 2102 y 2107.

Particularmente, la referida Oficina tiene a su cargo la inspección de notarías y el examen de los protocolos, así como cualquier otra función relacionada con la supervisión de los notarios y el ejercicio del notariado que este Tribunal y su Juez Presidente estimen convenientes. Véase: 4 L.P.R.A. sec. 2102; *In re Gómez Rijos*, ante, a las págs. 815-16. Esta labor de inspección será realizada, específicamente, por el Director de la O.D.I.N. y los inspectores de dicha Oficina, quienes deberán ser notarios de experiencia. Véase, 4.L.P.R.A. sec. 2102; P. Malavet Vega, Manual de Derecho Notarial Puertorriqueño, 2da. ed., Ponce, Ed. Estudios de Derecho Puertorriqueño, 1994, pág. 125.

En vista de la delicada función del notariado y de las implicaciones legales que conlleva un ejercicio defectuoso y descuidado del mismo, la Ley Notarial y su Reglamento delimitan un procedimiento específico para realizar las referidas inspecciones y para dilucidar cualquier controversia que pueda suscitarse en dicho proceso. Por ejemplo, en la Regla 77 del Reglamento Notarial se establece, entre otras cosas, el proceso de comunicación y coordinación de visitas que deberá

desarrollarse entre el abogado y el inspector a los fines de efectuar la inspección notarial. 4 L.P.R.A. Ap. XXIV R. 77 (A)-(D). Asimismo, se dispone que la inspección se llevará a cabo en la oficina del notario y que "[u]na vez comenzada, será continuada en lo posible, de día a día, hasta tanto sea completada." 4 L.P.R.A. Ap. XXIV R. 77(E). El inspector le dejará diariamente al notario una hoja de trabajo, en la que hará un señalamiento preliminar de aquellas faltas encontradas durante ese día. 4 L.P.R.A. Ap. XXIV R. 77 (F)-(G). De este modo, se le brinda una oportunidad al notario para que vaya corrigiendo las faltas señaladas durante el curso del procedimiento de inspección, aligerando, así, dicho proceso.

Si luego de finalizado el examen, el inspector no aprueba el protocolo o el registro de testimonios pautará una reunión final para determinar si las faltas preliminares señaladas fueron subsanadas y para discutir con el notario cualquier divergencia de criterio que haya surgido con respecto a la inspección. 4 L.P.R.A. Ap. XXIV R. 77 (H)-(I). En caso de determinar que hubo una total subsanación de las faltas, y en ausencia de divergencia de criterio entre el notario y el inspector, este último procederá a aprobar la obra notarial y remitirá un informe final al Director de la O.D.I.N. 4 L.P.R.A. Ap. XXIV R.77(J). Por el contrario, si luego de celebrada la reunión final subsiste falta o divergencia de criterio, el inspector remitirá su informe al Director de la O.D.I.N.

dentro de un término de sesenta (60) días, notificando copia del mismo al notario.[4] 4 L.P.R.A. Ap. XXIV R. 77(K).

Una vez el inspector somete su informe final ante la consideración del Director de la O.D.I.N. comienza una segunda fase en el proceso de inspección notarial. Al recibir el referido informe, la O.D.I.N. se lo notificará al notario quien tendrá quince (15) días a partir de ese momento para notificar a dicha Oficina sus objeciones al informe del inspector, si las tuviese. Posterior a esto, y en un término de cuarenta y cinco (45) días desde la fecha del informe final, el Director de la O.D.I.N. podrá escoger cualquiera de los siguientes cinco cursos de acción: (i) puede concederle al notario un término adicional para que subsane las faltas; (ii) puede iniciar o instruir al inspector para que inicie un procedimiento de divergencia de criterio establecido en el Artículo 63 de la Ley Notarial, 4 L.P.R.A. sec. 2103 y en la Regla 80 del Reglamento Notarial; (iii) puede determinar que el notario no ha incurrido en las faltas imputadas y en tal caso instruirá al inspector para que apruebe la obra notarial; (iv) puede decretar el sobreseimiento, por no

---

[4] Con relación a esta primera fase del proceso de inspección correctamente se ha comentado que la misma "provee a los Notarios las más amplias oportunidades de subsanación de faltas cometidas en la práctica notarial. No tiene explicación racional alguna que ocurran casos en que por desatención a su deber de diligencia se dejen de corregir las faltas determinadas, que generalmente son de fácil subsanación." Torres Peralta, El Derecho Notarial Puertorriqueño, ante, a la pág. 17.7.

justificarse acción posterior alguna; o (v) <u>puede someter</u> <u>un informe al Tribunal Supremo junto con cualesquiera</u> <u>escritos que haya recibido del notario para que sea dicho</u> <u>foro el que disponga lo que procede</u>. Regla 79 del Reglamento Notarial, ante.

En el presente caso el licenciado Godinez sostiene que la Directora de la O.D.I.N. dejó transcurrir los términos establecidos en las Reglas 79 y 80 del Reglamento Notarial. En consecuencia, arguye que la Directora de la O.D.I.N. ya no puede recurrir al remedio de someter el asunto ante la consideración del Tribunal Supremo y que no le queda otra alternativa que no sea la de aprobar el protocolo de 1994. Dicha posición es una errada. Veamos, por qué.

B

Como señalamos, el término de cuarenta y cinco (45) días establecido en la Regla 79 del Reglamento Notarial estatuye el tiempo que tiene la Directora de la O.D.I.N. para escoger uno de los cinco cursos de acción que este funcionario tiene a su disposición luego de recibir el informe final del inspector relacionado a la determinación de faltas en la obra notarial o a la existencia de divergencia de criterio entre el inspector y el notario. En el caso de marras la Directora de la O.D.I.N. optó por someter el asunto ante la consideración de este Tribunal conforme lo establecido en el Inciso E de la Regla 79;

ello mediante la presentación de un informe sometido ante nos el 13 de noviembre de 2000.

El licenciado Godinez plantea que este Tribunal no puede entrar a considerar la cuestión aquí en controversia ya que la Directora optó por iniciar el procedimiento establecido en la Regla 79(E) luego de transcurrido el término de cuarenta y cinco (45) días desde que se presentó, ante la consideración de la Directora, el informe final de la Inspectora. Éste alega que el referido informe final fue presentado el 10 de septiembre de 1999, por lo que era a partir de dicha fecha que debía computarse el término en cuestión.

En primer lugar, es menester señalar que si bien es cierto que el 10 de septiembre de 1999, la Inspectora sometió un informe a la Directora de la O.D.I.N, el mismo no fue el informe final contemplado en la Regla 79. Por el contrario, dicho informe fue el primero de varios informes que se le estuvieron presentando a la Directora durante el transcurso del proceso de inspección de la obra notarial del licenciado Godinez.

Recordaremos que el informe del 10 de septiembre de 1999 versaba sobre las diferencias de criterio existentes entre el notario y la Inspectora relacionadas al protocolo de 1994. Con la presentación del mismo no culminó el proceso de inspección de la obra notarial del licenciado Godinez, sino que, por el contrario, dicho proceso continuó. Fueron varios los trámites que se efectuaron

luego de la presentación de este primer informe, entre ellos: reuniones y comunicaciones escritas entre el notario y la Directora; la concesión de términos adicionales para que el notario corrigiera las faltas subsistentes en su obra notarial; la consolidación del proceso de inspección del protocolo de 1994 con los protocolos correspondientes a los años 1995 a 1998 para evaluar en un mismo procedimiento aquellas faltas recurrentes en toda la obra notarial de Godinez; nuevos señalamientos de faltas; varias visitas de reinspección; la presentación de un segundo informe ante la Directora por parte de la Inspectora; la aprobación de los protocolos de 1995 y 1996, entre otros.[5]

Una vez culminó totalmente el proceso consolidado de inspección de los protocolos de 1994-1998, el 25 de septiembre de 2000, la Inspectora presentó, ante la consideración de la Directora, un último informe. Es precisamente este último el informe final al que se hace referencia en la Regla 79. Con la presentación del mismo

---

[5] Adviértase que las disposiciones de la Ley Notarial y su Reglamento otorgan a la O.D.I.N. y a su Directora amplia discreción para supervisar el ejercicio del notariado y para canalizar los trabajos de inspección según lo estimen conveniente. Véase: Artículo 62 de la Ley Notarial, ante, 4 L.P.R.A. sec. 2102; Reglas 77 y 79 del Reglamento; Torres Peralta, El Derecho Notarial Puertorriqueño, ante, a las págs. 17.9-17.10. Ello explica porque en el presente caso se realizaron otros trámites y se proveyeron oportunidades adicionales para que el notario corrigiera las faltas señaladas en su obra notarial previo a iniciar, ante este Tribunal, el procedimiento dispuesto en la Regla 79 (E) del Reglamento.

fue que culminó el proceso de inspección de la obra notarial del licenciado Godinez, por lo que era a partir del 25 de septiembre de 2000 --y no a partir del 10 de septiembre de 1999-- que comenzó a transcurrir el término de cuarenta y cinco (45) días para que la Directora tomara uno de los cursos de acción dispuestos en la Regla 79.

Ahora bien, aun si tomamos el 25 de septiembre de 2000 como punto de partida para computar dicho término, notamos que la Directora actuó fuera del mencionado término de cuarenta y cinco (45) días, ya que no fue sino hasta el 13 de noviembre de 2000 que finalmente tomó uno de los cursos de acción establecidos en la Regla 79. Esto es, transcurrieron cuatro días en exceso del término de cuarenta y cinco (45) días provisto en la referida Regla.

Ello no obstante, sería irrazonable y poco práctico aceptar la tesis presentada por el licenciado Godinez. Éste plantea que el referido término, así como los demás términos dispuestos en la Ley y el Reglamento Notarial para que los funcionarios de la O.D.I.N. actúen en el proceso de inspección, son términos jurisdiccionales fatales capaces de subsanar los errores y faltas cometidas en la obra notarial y de impedir el ejercicio de la función disciplinaria de este Tribunal. Tal interpretación sería errónea puesto que ni la Ley ni el Reglamento le han conferido expresamente ese carácter.

Como es sabido, en materia de interpretación de estatutos se ha pautado que en aquellas ocasiones en que

el legislador ha querido que un término sea fatal o jurisdiccional así lo dispone expresamente en la ley. Véase: Pueblo v. Mojica Cruz, 115 D.P.R. 569, 575 (1984); G.M. Overseas v. D.A.C.O., 114 D.P.R. 5 (1983); J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, Ed. Publicaciones J.T.S., San Juan, 2000, T. II, págs. 1155-56. Es por ello, que cuando la ley no contenga una expresión, a tales efectos, el término deberá entenderse como uno directivo.[6] Ibid. En tal virtud, y considerando la inexistencia de un lenguaje que le otorgue carácter fatal a los referidos términos, resolvemos que los cuarenta y cinco (45) días dispuestos en la Regla 79, así como todos los demás términos contemplados en la Ley y el Reglamento Notarial para que la O.D.I.N. y sus funcionarios actúen en el proceso de inspección, sólo constituyen términos directivos.[7] Véase, Torres Peralta, El Derecho Notarial Puertorriqueño, ante, págs. 17.9, 17.11 y 17.14.

---

[6] Ello responde al principio de hermenéutica que dispone que al interpretar una ley los tribunales no deben añadir palabras o conceptos distintos a los incluidos por el legislador. Cuando los términos de un estatuto son claros e inequívocos se deben interpretar al pie de la letra. Artículo 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14; véase, además: First Bank v. Mun. de Aguadilla, res. el 17 de enero de 2001, 2001 T.S.P.R. 6; Irizarry v. Johnson & Johnson Consumer Products, Co., Inc., res. el 27 de enero de 2000, 2000 T.S.P.R. 15.

[7] Igual interpretación le hemos otorgado a los términos que la Ley Hipotecaria y su Reglamento disponen para que el Registrador de la Propiedad actúe. Por ejemplo, hemos pautado que el término que tiene dicho funcionario para actuar con relación a una solicitud de recalificación es directivo. Senior Las Marías Corp. v. Registrador, 113

(Continúa . . .)

A esos efectos se ha señalado que en lo que respecta al procedimiento ordinario de inspección de protocolos y registros establecido en la Regla 77 del Reglamento "[l]a única forma [en] que los inspectores pueden descargar debidamente sus funciones es interpretando la Regla 77 como de carácter directivo." Torres Peralta, El Derecho Notarial Puertorriqueño, ante, pág. 17.14, n. 34. Por otra parte, y con relación al procedimiento ante el Director de la O.D.I.N. establecido en la Regla 79, correctamente se ha señalado que "[d]icho término es meramente directivo y en nada podrá obligar al Director de la O.D.I.N. en el descarg[o] de sus funciones de inspección de la profesión notarial que le han sido delegadas, y mucho menos al Tribunal Supremo en el ejercicio de su jurisdicción disciplinaria." Torres Peralta, El Derecho Notarial Puertorriqueño, ante, pág. 17.9, n. 19. De ninguna manera podemos permitir que los referidos términos se conviertan en obstáculos que le impidan a la O.D.I.N. y a este Tribunal ejercer cabalmente sus funciones relacionadas a la supervisión de la profesión notarial.[8]

_____

D.P.R. 675, 683-84 n.5 (1982). La misma normativa se impone con respecto a la O.D.I.N. y a sus funcionarios en el proceso de inspección notarial.

[8] Ciertamente, en el presente caso, se impone una interpretación flexible y realista de los términos dispuestos en la Ley y Reglamento Notarial con relación al proceso de inspección; más aun si tomamos en consideración los factores que inciden en el referido proceso. Algunos de estos factores son: (i) el alto número de notarios activos y el reducido número de inspectores, actualmente

(Continúa . . .)

En el presente caso la O.D.I.N., dentro de su amplia discreción, le ofreció al licenciado Godinez <u>múltiples oportunidades</u> para subsanar las faltas encontradas en su obra notarial; ello antes de recurrir a este Alto Foro. Además, al referido notario se le proveyó, en todo momento, un debido proceso de ley dentro del cual tuvo la oportunidad de reunirse personalmente con la Inspectora y la Directora de la O.D.I.N. y de objetar los señalamientos e informes presentados por estas funcionarias. En virtud de ello entendemos que la demora de <u>sólo</u> cuatro (4) días en el término directivo establecido en la Regla 79, de ninguna manera ha perjudicado los derechos del notario ni ha constituido una carga onerosa para éste. Por lo tanto, dicha demora tampoco puede impedir que la Directora utilice el mecanismo establecido en la Regla 79(E), cerrándole así las puertas a este Tribunal para considerar la presente controversia.[9] Resolvemos, en consecuencia, que

---

hay alrededor de siete mil quinientos (7,500) notarios y sólo dieciocho (18) inspectores; (ii) el área geográfica que cubre cada inspector; (iii) el volumen de la obra notarial pendiente de inspección; (iv) la carga de trabajo de los inspectores; (v) dificultades en la coordinación de visitas; (vi) distancias que el inspector tiene que recorrer; entre otros. Información obtenida de la Oficina de Inspección de Notarías a noviembre de 2003; véase, además: <u>Mojica Sandoz</u> v. <u>Bayamón Federal Savings and Loan Association of P.R.</u>, 117 D.P.R. 110, 116 n.3 (1986); Torres Peralta, <u>El Derecho Notarial Puertorriqueño</u>, ante, pág. 17.5, n. 6.

[9] Advertimos, sin embargo, que lo anteriormente expresado no releva a la Directora de la O.D.I.N., ni a sus funcionarios, de la obligación de hacer un esfuerzo máximo

(Continúa . . .)

la demora incurrida por la Directora al iniciar el proceso establecido en la Regla 79(E) no priva a este Tribunal de ejercer su jurisdicción sobre la controversia que hoy se trae ante su consideración.

Por otro lado, el licenciado Godinez plantea que como la Directora de la O.D.I.N. no instruyó a la Inspectora para iniciar el procedimiento para dilucidar divergencias de criterio en los ciento veinte (120) días dispuestos en la Regla 80, aplica aquella porción del Inciso D de la referida Regla que establece que "[d]e no ser iniciado el procedimiento dentro de tal término, se presumirá que el Inspector ha aceptado el criterio del Notario..." Regla 80 del Reglamento Notarial, ante; véase, además: Artículo 63 de la Ley Notarial, ante; 4 L.P.R.A. sec. 2103.

La Regla 80 dispone un procedimiento que, sujeto a las instrucciones del Director de la O.D.I.N, el inspector puede iniciar ante el Tribunal de Primera Instancia en casos donde exista una o más divergencias de criterios entre el inspector de protocolos y el notario. Para iniciar el mismo la Regla dispone un término de ciento veinte (120) días contados a partir del momento en que el Director recibe el informe final del inspector.

El referido mecanismo es sólo uno más de los cinco cursos de acción que, según mencionamos anteriormente, el Director de la O.D.I.N. tiene disponible en ocasión de

_____

por cumplir con los términos dispuestos dentro del proceso de inspección notarial.

recibir el informe final del inspector. Véase: Regla 79(B) del Reglamento Notarial, ante. Como señalamos, el Director de la O.D.I.N. tiene la libertad de escoger cualquiera de los cinco cursos de acción contemplados en la Regla 79 del Reglamento Notarial, ello sin que, de ninguna manera, esté obligado a optar por uno en específico. A dicho funcionario se le ha conferido amplia discreción para escoger aquel remedio que entienda más conveniente para la situación particular que se le presente. Además, el lenguaje de dicha Regla no es restrictivo en cuanto a ese aspecto. A esos efectos, resultan pertinentes los comentarios contenidos en el Reglamento Notarial en torno a la Regla 79. Allí se señala:

> Esta regla enumera las alternativas accesibles al Director de la Oficina de Inspección de Notarías; luego de finalizada una inspección donde existen faltas señaladas o divergencias de criterios. El Director de la Oficina de Inspección de Notarías seleccionará el curso de acción que seguirá según los hechos particulares ante él. 4 L.P.R.A. Ap. XXIV, R. 79.

A tono con lo anterior, se ha manifestado que "[e]l Director de la O.D.I.N. tiene la facultad discrecional de remitir al Tribunal Supremo su informe negativo sobre la actividad notarial de un abogado Notario o, en la alternativa, de remitirlo al foro judicial para que allí se diluciden las discrepancias entre ambos." Torres Peralta, El Derecho Notarial Puertorriqueño, ante, pág. 17.10. Asimismo, correctamente se ha señalado que "[e]l Director de O.D.I.N. no está obligado a utilizar el

procedimiento judicial ante el Tribunal Superior. ... En su lugar, puede recurrir directamente al Tribunal Supremo mediante la remisión de su informe. ..." *Ibid*, a la pág. 17.15, n. 36.

No hay duda de que la decisión en torno a si el asunto en controversia debe someterse ante el tribunal de instancia o si merece ser sometido ante la consideración del Tribunal Supremo recae exclusivamente en el Director de la O.D.I.N. dentro de sus facultades discrecionales. En el presente caso la Directora optó por no someter la controversia ante el tribunal de instancia, sino que dentro de sus prerrogativas, prefirió brindarle mayores oportunidades al notario para que corrigiera sus faltas y finalmente seleccionó la alternativa de someter el asunto ante la consideración de este Tribunal. El proceso que se inicia en el tribunal de instancia establecido en el Artículo 63 de la Ley y en la Regla 80 del Reglamento <u>no es requisito previo ni indispensable</u> para poder recurrir directamente al Tribunal Supremo, sino sólo una alternativa más que la Directora tenía a su alcance y que en esta ocasión decidió no utilizar. La Directora, efectivamente, podía acudir de primera intención al Tribunal Supremo si así lo estimaba conveniente.

En vista de que la Directora no seleccionó seguir el curso de acción establecido en la Regla 80, resulta forzosa la conclusión de que el término de ciento veinte (120) días allí dispuesto no es de aplicación al caso de

autos. Resulta improcedente la pretensión del licenciado Godinez de abrogarse la facultad de determinar el curso de acción que el organismo inspector debía seguir. Dicha facultad, repetimos, le corresponde exclusivamente a la Directora de la O.D.I.N.

III

Por otro lado, el licenciado Godinez aduce que la Inspectora de la O.D.I.N. se excedió en sus facultades de inspección al señalar como falta la omisión de consignar la procedencia o carácter privativo de los bienes inmuebles hipotecados en varias escrituras otorgadas por personas casadas en las cuales sólo comparecía uno de los cónyuges. Por su parte, la Directora de la O.D.I.N. sostiene que los señalamientos hechos por la Inspectora estaban dentro del ámbito de sus funciones. Manifiesta, además, que la consignación de los datos omitidos por el notario eran esenciales y necesarios para que la Inspectora pudiera desempeñar su obligación de velar porque el notario cumpliera con las formalidades exigidas en el Artículo 15(d) de la Ley Notarial.

A

Sabido es que la autoridad y validez de un instrumento público depende de que el notario autorizante acate fiel e inteligentemente los requisitos y formalidades que le impone la Ley Notarial de Puerto Rico.

Cintrón Ramos v. Registrador, 144 D.P.R. 91, 99 (1997); Sucn. Santos v. Registrador, 108 D.P.R. 831, 834 (1979). Es por ello que al notario le corresponde la función de ser el primer calificador de la legalidad y suficiencia de los documentos que luego serán presentados ante el Registrador de la Propiedad, quien hará la calificación final de éstos. Cintrón Ramos v. Registrador, ante; Fed. Pesc. Playa Picúas v. U.S.Inds., Inc., 135 D.P.R. 303, 326 n.30 (1994); Kogan v. Registrador, 125 D.P.R. 636, 674 (1990); Rosado Collazo v. Registrador, 118 D.P.R. 577, 583 (1987); Empire Life Ins. Co. v. Registrador, 105 D.P.R. 136, 139 (1976).

Los inspectores de la O.D.I.N. tienen un rol de suma importancia en este proceso de calificación ya que están encargados de supervisar que los notarios hayan dado fiel cumplimiento a la legislación notarial. *In re* Colón Muñoz, 131 D.P.R. 121, 151 (1992). Esto es, su función estriba en fiscalizar la labor y responsabilidad del notario en lo que se refiere a la observancia de las disposiciones de la Ley y el Reglamento Notarial. Martínez Surís v. Colón Muñoz, 131 D.P.R. 102, 112 (1992); Rivera Miranda v. Betancourt, 111 D.P.R. 147, 140-50 (1981). A esos efectos hemos expresado que la intervención de los inspectores "signific[a] una acción beneficiosa para el prestigio de la institución notarial y constituy[e] una garantía real de la eficiente y correcta actuación de los colegiados en el desempeño y cumplimiento de las obligaciones que

imponen  las leyes y reglamentaciones para el ejercicio de la fe pública notarial."[10]

La Ley Notarial establece, en términos generales, el ámbito de la inspección notarial disponiendo que la misma cubre "la forma y manera de llevar éste sus protocolos y Registros de Testimonios con respecto al cumplimiento de este capítulo la cancelación de derechos o cualquier otra ley relacionada con las formalidades de los instrumentos o documentos. ..." Artículo 63 de la Ley Notarial, 4 L.P.R.A. sec. 2103. Específicamente, los inspectores deben velar por el fiel cumplimiento de: (i) la Ley Notarial y su Reglamento; (ii) la Ley del Arancel Notarial; (iii) la reglamentación relacionada a los sellos de Rentas Internas, Impuesto Notarial y el sello de la Sociedad para Asistencia Legal; y (iv) toda legislación o reglamentación adicional referente a las formalidades de los instrumentos públicos o documentos notariales, como por ejemplo: las disposiciones sobre las formas de los testamentos contenidas en el Código Civil; disposiciones formales de la Ley Hipotecaria y su Reglamento; disposiciones sobre las formalidades requeridas por la Ley de Propiedad Horizontal; entre otras. Rivera Miranda v. Betancourt,

---

[10] Soto de Bernier v. Rivera Cestero, 106 D.P.R. 35, 39 (1977), citando a Argentino I. Neri, Tratado Teórico y Práctico de Derecho Notarial, Vol. 4, Ed. 1971, págs. 114-15.

ante, a las págs. 149-50; Soto de Bernier v. Rivera Cestero, 106 D.P.R. 35, 37-38 (1977).[11]

Ahora bien, la labor de los inspectores no es equivalente a la función calificadora de títulos que tiene el Registrador de la Propiedad. Rivera Miranda v. Betancourt, ante, a la pág. 149. Los inspectores carecen de facultad para calificar el aspecto sustantivo de los documentos que forman parte del protocolo, esto es, no pueden investigar la validez sustantiva del acto o negocio jurídico contenido en los instrumentos públicos objeto de inspección. Tampoco pueden adentrarse en la interpretación del título autorizado notarialmente asumiendo, así, funciones interpretativas o declarativas del Derecho que sólo le corresponden al notario, al Registrador de la Propiedad y, en última instancia, al foro judicial. Véase: Rivera Miranda v. Betancourt, ante, a las págs. 149-50; Soto de Bernier v. Rivera Cestero, ante, a las págs. 37-38; Torres Peralta, El Derecho Notarial Puertorriqueño, ante, págs. 18.2-18.5; Malavet Vega, Manual de Derecho Notarial Puertorriqueño, ante, a la pág. 126.[12] En síntesis, la función de los referidos inspectores se ciñe

---

[11] Véase, además: Torres Peralta, El Derecho Notarial Puertorriqueño, ante, págs. 18.2-18.3; Cándida R. Urrutia y Luis M. Negrón Portillo, Curso de Derecho Notarial Puertorriqueño, 2da. ed., San Juan, 1997, págs. 581-82; Malavet Vega, Manual de Derecho Notarial Puertorriqueño, ante, a la pág. 126.

[12] Véase, además: Cándida R. Urrutia, Las Advertencias Legales en Instrumentos Públicos, 33 Rev. Jur. U.I.P.R. 491, 497 (1999).

fundamentalmente a constatar las formas y solemnidades de los documentos notariales que obran en los protocolos y registros de testimonios de los notarios.

Refiriéndonos, específicamente, a las formas y solemnidades exigidas en la Ley Notarial, tenemos que en su Artículo 15 dicha Ley establece los requisitos generales de contenido de las escrituras públicas. Cándida R. Urrutia y Luis M. Negrón Portillo, Curso de Derecho Notarial Puertorriqueño, 2da. ed., San Juan, 1997, págs. 315-17. Estos se refieren a requerimientos formales que deberán observarse en el otorgamiento y autorización de escrituras ya que, de otro modo, su incumplimiento podría acarrear la nulidad o anulabilidad de éstas. Artículos 34 y 35 de la Ley Notarial, 4 L.P.R.A. secs. 2052-2053.

Uno de estos requisitos es el deber de consignar la comparecencia de los otorgantes según lo exige el inciso D del referido Artículo 15.[13] El mismo dispone, en lo aquí pertinente, que en las escrituras públicas deberá consignarse "[e]l nombre y apellido o apellidos, según fuere el caso, edad o mayoridad, estado civil, profesión y vecindad de los otorgantes, su número de Seguro Social, de éstos tenerlo, nombre y circunstancias de los testigos, de

---

[13] Véase, además, la Regla 27 del Reglamento Notarial la cual complementa al referido Artículo 15 al disponer que "[e]l notario dejará consignado en el instrumento público la calidad en que intervienen los comparecientes, bien fuere como otorgante, como testigo, en capacidad representativa o en cualquier otro concepto." 4 L.P.R.A. Ap. XXIV R. 27.

haber alguno, según sus dichos." Además, provee para aquellos casos en que el otorgante casado comparece solo en la escritura. A esos efectos establece que "[e]n caso de que cualquiera de [los] otorgantes fuera casado, y <u>no sea necesaria</u> la comparecencia del cónyuge, se expresará el nombre y apellido de éste aunque no comparezca al otorgamiento." 4 L.P.R.A. sec. 2033 (énfasis nuestro). Asimismo, la Regla 25 del Reglamento Notarial aclara que "[c]uando <u>no fuere necesaria</u> la comparecencia del cónyuge de un otorgante, el único dato requerido es el nombre completo de éste." 4 L.P.R.A. Ap. XXIV, R. 25 (énfasis nuestro).

De entrada, debe quedar claro que siendo la <u>comparecencia un requisito de forma y contenido de los instrumentos públicos, la función de velar por el cumplimiento de dicha solemnidad resulta ser de la incumbencia de los inspectores de la O.D.I.N</u>. Como vimos, el precitado Artículo 15(d) dispone las circunstancias que deben ser consignadas en un documento público con relación a los otorgantes. Además, establece que <u>siempre que no sea necesaria</u> la comparecencia del cónyuge del otorgante, el notario cumple a cabalidad con el requisito de comparecencia con la sola consignación del nombre del cónyuge, ello sin necesidad de incluir sus circunstancias personales.

A todas luces se advierte que para que un inspector pueda evaluar el cumplimiento con las formalidades

dispuestas en el referido Artículo, éste vendrá obligado a realizar un breve análisis sobre la necesidad de que el cónyuge del otorgante comparezca en el documento. Esto es, para determinar si con la sola consignación del nombre del cónyuge del otorgante, el notario cumplió con el requisito de comparecencia, el inspector tendrá que examinar si de la faz del documento surge que la comparecencia del cónyuge no era necesaria. Naturalmente, ello exige que los notarios consignen en los documentos públicos aquella información que le permita a los inspectores efectuar esta evaluación.

En situaciones como la contemplada en el presente caso, donde se trata de escrituras sobre hipoteca de bienes inmuebles otorgadas por personas casadas, dicha evaluación consistirá en verificar si del referido documento se desprende el carácter privativo del bien que se intenta gravar. Ello en vista de que la única instancia en que resulta innecesaria la comparecencia del cónyuge del otorgante es cuando el bien inmueble objeto de transmisión o gravamen pertenece privativamente a la parte otorgante.

Como es sabido, cuando se trata de la enajenación o gravamen de un bien mueble o inmueble perteneciente a la sociedad legal de gananciales, la comparecencia de ambos cónyuges es indispensable ya que, en términos generales, una transacción de esa clase requiere el consentimiento escrito de ambos. Véase: Artículo 1313 del Código Civil,

31 L.P.R.A. sec. 3672; Aguilú v. Sociedad de Gananciales, 106 D.P.R. 652 (1977); Soc. de Gananciales v. Soc. de Gananciales, 104 D.P.R. 50 (1975); Torres Peralta, El Derecho Notarial Puertorriqueño, ante, a las págs. 8.12-8.14; Urrutia y Negrón Portillo, Curso de Derecho Notarial Puertorriqueño, ante, a las págs. 316-17.

Lo anteriormente expresado implica que el inspector deberá examinar los antecedentes que motivaron el negocio jurídico, según consignados en la escritura, de los cuales deberá surgir el carácter privativo o ganancial del inmueble en cuestión. Resulta importante señalar que el examen de estos elementos está dentro del ámbito de inspección de los inspectores de la OD.I.N. ya que la propia Ley Notarial exige, como parte de las formalidades que toda escritura pública debe contener, la consignación de los antecedentes. A esos efectos el precitado Artículo 15 dispone que los notarios deberán incluir en las escrituras "en adición al negocio jurídico que motiva el otorgamiento ... sus antecedentes. ..." 4 L.P.R.A. sec. 2033 (énfasis nuestro). Además, se ha señalado que en toda escritura pública deberá consignarse:

> [T]oda la información necesaria relativa a la inscripción registral, su titularidad, sus antecedentes y el hecho de estar gravad[a], expresión que debe[rá] hacer[se] incluyendo una relación de las cargas y gravámenes a que está afect[a]. También incluirá cualquier otra información que, a juicio prudente del Notario,

forme parte de los antecedentes pertinentes al negocio jurídico que motiva el otorgamiento.[14]

Ciertamente, cuando el cónyuge de la persona otorgante no figura como parte compareciente en una escritura, la información sobre el carácter privativo del bien o derecho que se grava o transmite se convierte, _necesariamente_, en un antecedente pertinente e importantísimo del negocio jurídico que _debe ser consignado_ para que de la faz de la escritura pueda constatarse que han comparecido al otorgamiento todas las personas que de conformidad con la ley tienen que comparecer. Artículo 34 de la Ley Notarial; 4 L.P.R.A. sec. 2052. Es mediante la consignación de estos datos que los inspectores podrán verificar si la comparecencia del cónyuge del otorgante era o no necesaria y, así, finalmente determinar si el notario cumplió adecuadamente con el requisito formal de la comparecencia a tenor con el Artículo 15(d).

B

En el presente caso, el notario _no_ consignó los elementos necesarios para que la Inspectora pudiese determinar si en varias de las escrituras autorizadas por éste, se requería la comparecencia de los cónyuges de los otorgantes. Si bien de las mismas surgía que la parte

---

[14] Torres Peralta, _El Derecho Notarial Puertorriqueño_, ante, a las pág. 8.4.

otorgante era casada, su cónyuge no comparecía como otorgante, sino que sólo se mencionaba por su nombre. De la faz de los instrumentos públicos no se desprendía la procedencia privativa del inmueble que se hipotecaba, esto es, no se consignó si se había adquirido antes del matrimonio, por herencia, con dinero privativo, o si había mediado capitulaciones matrimoniales con separación de bienes. No habiéndose consignado los antecedentes del bien inmueble objeto del negocio jurídico --ello en contravención con los requisitos de forma y contenido de las escrituras públicas-- la Inspectora se vio impedida de evaluar si se requería la comparecencia del cónyuge del otorgante y, en consecuencia, de corroborar si el notario cumplió cabalmente con los requisitos de forma establecidos en el precitado Artículo 15(d), relativos a la comparecencia en los instrumentos públicos.

Al realizar los referidos señalamientos de faltas, la Inspectora no se involucró en el aspecto sustantivo y medular del negocio jurídico contenido en la escritura. Tampoco intentó cuestionar la validez de la transacción jurídica efectuada entre las partes. Por el contrario, sus señalamientos se limitaron a corroborar si la comparencia en las referidas escrituras se hizo conforme a los requisitos de forma estatuidos en la Ley Notarial y su Reglamento; función que, como hemos mencionado, se

encuentra dentro de las facultades de supervisión que le han sido conferidas a los inspectores.[15]

Ciertamente, el requisito de comparecencia dispuesto en el Artículo 15(d) está fundamentado en normas de derecho sustantivo y su incumplimiento podría tener repercusiones en la validez del negocio jurídico. Ese hecho, sin embargo, por sí sólo no puede tener el efecto de excluirlo absolutamente del ámbito de la inspección notarial. Independientemente de los efectos sustantivos que el incumplimiento del mismo pudiera acarrear, no es posible soslayar el hecho de que el referido requisito de comparecencia constituye, además, un requerimiento de forma y contenido exigido en toda escritura pública que debe estar bajo el escrutinio de los inspectores de la O.D.I.N.

En virtud de lo antes expuesto, resolvemos que el licenciado Godinez falló al no hacer constar la procedencia o carácter privativo de los inmuebles que serían gravados; datos que resultaban indispensables para que la Inspectora de la O.D.I.N. pudiera ejercer su facultad de inspeccionar requerimientos de forma tales como la suficiencia de la comparecencia en los

---

[15] Además, al actuar de ese modo la Inspectora estaba cumpliendo con una directriz impartida por el entonces Director de la O.D.I.N que le impuso a los inspectores la fiscalización del requisito de comparecencia de ambos cónyuges en escrituras públicas donde se efectuaran actos de disposición de bienes inmuebles pertenecientes a la sociedad de gananciales. Véase: Nota al calce número 1.

instrumentos públicos. Por lo tanto, la Inspectora no se excedió en sus funciones al actuar como lo hizo.

IV

Por último, nos corresponde examinar el defecto señalado en la escritura núm. 442 del protocolo de 1994 del licenciado Godinez donde se suplió la omisión de no haber consignado la fe del conocimiento y capacidad de los otorgantes mediante una nota añadida luego de la firma de los otorgantes, la cual sólo fue firmada por el notario.

A

Es por todos conocido que el notario ejerce una función de inestimable importancia al ser custodio de la fe pública. *In re* Rivera Vázquez, res. el 10 de octubre de 2001, 2001 TSPR 138; *In re* Feliciano Ruiz, 117 D.P.R 269, 275 (1986). La importancia que tiene la fe pública notarial dentro del tráfico de bienes, exige que el notario sea en extremo cuidadoso y que desempeñe su ministerio con esmero, diligencia y estricto celo profesional. *In re* Rivera Vázquez, ante. Ese celo y cuidado debe desplegarse no sólo al momento de autorizar un instrumento público, sino también, posterior a ese momento si el notario advierte que dicho documento adolece de defectos u omisiones que ameritan ser corregidas. En tales casos, y con el fin de preservar la verdad y la fe

pública, el notario deberá observar los mecanismos que la Ley y el Reglamento Notarial proveen para ello. *Ibid.*

El notario tiene a su disposición dos mecanismos principales a través de los cuales puede corregir defectos u omisiones en los instrumentos públicos, a saber: las actas de subsanación y las escrituras de rectificación. En cuanto al uso del acta de subsanación la Ley Notarial dispone, en su Artículo 29, que:

> Si se dejase de hacer constar por el notario algún dato o circunstancia dispuesto por este capítulo, o si se tratase de error en el relato de hechos presenciados por el notario que corresponda a éste consignar; podrán estas faltas ser subsanadas por el notario autorizante a sus expensas, por propia iniciativa o a instancia de cualquiera de las partes, por medio de acta notarial en que se haga constar el defecto o error, su causa y la declaración que lo subsana. 4 L.P.R.A. sec. 2047.

Por su parte, la Regla 39 del Reglamento Notarial regula, específicamente, el otorgamiento de las actas de subsanación. La misma dispone, en lo aquí pertinente, que:

> Es acta de subsanación el instrumento que redacta el notario, sin intervención de las partes otorgantes y sin perjuicio de tercero, para corregir los defectos u omisiones de que adolezca un instrumento público previo. El notario hará constar en el acta que la subsanación obedece a datos o hechos que presenció o que de otro modo le constan personalmente y que no afectan el negocio jurídico.
>
> Excepto en los testamentos, pueden ser objeto de acta de subsanación, a manera de ejemplo, asuntos tales como:
> . . . .

(E) <u>La falta de expresión notarial sobre la identidad o la capacidad de los otorgantes.</u>[16]
. . . .

Como vemos, cuando el defecto u omisión no afecta sustantivamente el contrato o negocio jurídico objeto de la escritura pública, el notario podrá corregirlo, por sí solo, sin necesidad de requerir la presencia de los comparecientes. Torres Peralta, <u>El Derecho Notarial Puertorriqueño</u>, ante, págs. 8.61; Urrutia y Negrón Portillo, <u>Curso de Derecho Notarial Puertorriqueño</u>, ante, pág. 443. Ahora bien, dicha corrección deberá hacerla a través de un acta notarial de subsanación. Si examinamos el inciso (E) de la precitada Regla 39, podemos advertir que la omisión de consignar expresamente la fe de conocimiento o identidad de los otorgantes, así como la fe de la capacidad de éstos, constituyen defectos que la referida Regla específicamente provee para que sean subsanados mediante acta notarial.

Por otro lado, cuando el error u omisión esté relacionado al negocio jurídico entre las partes contratantes el notario estará impedido de subsanarlo por sí solo. En tales circunstancias se requerirá nuevamente la comparecencia de los otorgantes para corregir o rectificar el defecto. Sin embargo, ya no podrá utilizarse el acta notarial, sino que deberá otorgarse una escritura

---

[16] 4 L.P.R.A. Ap. XXIV R.39 (énfasis nuestro).

de rectificación o corrección. Véase: Artículo 29 de la Ley Notarial, 4 L.P.R.A. sec. 2047;[17] Urrutia y Negrón Portillo, <u>Curso de Derecho Notarial Puertorriqueño</u>, ante, págs. 443-44; Torres Peralta, <u>El Derecho Notarial Puertorriqueño</u>, ante, págs. 8.62.

Aparte de estos dos mecanismos, la Ley Notarial provee otro método que permite al notario suplir algún dato indispensable que haya omitido o corregir algún defecto advertido luego de autorizado el documento público. El mismo está contemplado en el Artículo 32 de la Ley Notarial, 4 L.P.R.A. sec. 2050 y consiste en incluir adiciones o añadiduras en el instrumento público, las cuales deberán ser salvadas no sólo con la firma del notario, sino, además, con la de los comparecientes.

Ahora bien, si el notario intenta subsanar el defecto, por sí solo, incorporando las referidas adiciones sin requerir la firma de los otorgantes, éstas se tendrán por no puestas. Así lo dispone el referido Artículo 32, ante, al preceptuar que "[s]e tendrán por no puestas las adiciones ... en los instrumentos públicos a menos que se salven a continuación del último renglón con la aprobación expresa y la firma de los que deben suscribir el

---

[17] A esos efectos el referido Artículo dispone, en lo pertinente, que "[l]os defectos de que adolezcan los documentos notariales ínter vivos podrán ser subsanados, sin perjuicio de terceros, por las partes que hubiesen comparecido en el documento o por sus herederos o causahabientes por medio de una escritura pública en que se haga constar el defecto, su causa y la declaración que lo subsana". *Ibid*.

documento." 4 L.P.R.A. sec. 2050; véase, además: *In re*

*Rivera Vázquez*, ante. Asimismo, se ha señalado que:

> [S]e pueden adicionar frases, párrafos y disposiciones luego de las firmas. En tal caso se repetirá la fe pública y se salvará expresamente lo así adicionado por los otorgantes, repitiendo el otorgamiento mediante las firmas de los otorgantes y testigos, así como la firma, signo, sello y rúbrica del Notario autorizante. ... De incumplirse el procedimiento indicado ... se tendrán por no puestas. Se trata de un caso de nulidad parcial absoluta.[18]

B

En el presente caso el licenciado Godinez no consignó la fe de conocimiento y capacidad de los otorgantes en una de las escrituras que autorizó. Para corregir dicha omisión el notario tenía a su haber dos opciones. Como vimos, una de ellas consistía en añadir una nota al final de la referida escritura dando fe del conocimiento y capacidad de los otorgantes, la cual debía ser suscrita por el notario y los comparecientes mediante sus firmas, ello según lo dispuesto en el Artículo 32 de la Ley Notarial.[19] Por otro lado, si el notario prefería corregir

---

[18] Torres Peralta, El Derecho Notarial Puertorriqueño, ante, págs. 8.62 (nota al calce omitida).

[19] Claro está, este mecanismo requiere que --en ausencia de testigos instrumentales-- se cumpla con el Artículo 28 de la Ley Notarial en cuanto dispone que el notario recibirá personalmente las firmas de los comparecientes, en cualquier tiempo, pero siempre que ello ocurra dentro del mismo día natural del otorgamiento. Véase: 4 L.P.R.A. sec. 2046; *In re* Vargas Cintrón, res. el 5 de marzo de 2001, 2001 TSPR 45; *In re* Igartúa Muñoz, res. el 2 de febrero de 2001, 2001 TSPR 13; *In re* Torres Olmeda, 145 D.P.R. 384 (1998).

la omisión, por sí solo, podía recurrir al otorgamiento de un acta de subsanación, mecanismo que, como señalamos, estaba disponible para subsanar la falta de expresión notarial sobre el conocimiento y la capacidad de los otorgantes.

Ello no obstante, vemos que, en el caso de autos, el licenciado Godinez no utilizó ninguno de estos dos mecanismos de subsanación. En su lugar, optó por suplir la información omitida añadiendo una nota al final del documento, la cual sólo fue firmada y salvada por él. De este modo, alteró el documento público en ausencia de los otorgantes; ello en violación de la fe pública notarial y de las disposiciones claramente establecidas en la Ley y el Reglamento Notarial.

No habiéndose cumplido con los requisitos dispuestos en el Artículo 32 de la Ley Notarial, en cuanto a la manera de salvar las adiciones en los instrumentos públicos, resulta forzosa la conclusión de que la nota unilateralmente añadida por el notario debe tenerse por no puesta. En vista de que la referida escritura no fue subsanada adecuadamente, ésta continúa adoleciendo del defecto de no haberse expresado la fe de conocimiento y capacidad de los otorgantes, circunstancia que, a su vez,

puede ocasionar la anulabilidad de la misma. Véase: Artículo 35 de la Ley Notarial, 4 L.P.R.A. sec. 2053.[20]

No cabe la menor duda de que el licenciado Godinez, al no acatar las disposiciones de la Ley Notarial en cuanto a la manera correcta de subsanar los instrumentos públicas, afectó la institución de la fe pública notarial y puso en peligro la estabilidad del tráfico jurídico. En tal virtud, resolvemos que la Inspectora de la O.D.I.N. actuó correctamente al señalar esta falta en la obra notarial del referido abogado notario.

V

En mérito de lo antes expuesto, le ordenamos al licenciado Godinez que proceda de inmediato a subsanar las deficiencias señaladas en los protocolos correspondientes a los años 1994, 1997 y 1998, apercibiéndole que de no hacerlo, o de demorarse irrazonablemente en dicha gestión, quedará sujeto a la imposición de sanciones disciplinarias por este Tribunal.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado

---

[20] El referido Artículo dispone, en lo pertinente, que "[s]erán anulables los instrumentos públicos en que el notario no dé fe del conocimiento de los otorgantes. ..." *Ibid.*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Enrique Godinez Morales

                              TS-2414

SENTENCIA

San Juan, Puerto Rico, a 3 de febrero de 2004

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia ordenando al licenciado Godinez Morales que proceda de inmediato a subsanar las deficiencias señaladas en los protocolos correspondientes a los años 1994, 1997 y 1998, apercibiéndole que de no hacerlo, o de demorarse irrazonablemente en dicha gestión, quedará sujeto a la imposición de sanciones disciplinarias por este Tribunal.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señor Hernández Denton y señor Fuster Berlingeri no intervinieron.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo